UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA PROWISOR,

            Plaintiff,

vs.

BON-TON, INC., TOWN OF NEWBURGH,
ROGER S. ROTH, sued in his individual
capacity,

            Defendants.

--------------------------------------------------------x

05 CIV 00166 (WCC)

PLAINTIFF'S MEMORANDUM
OF LAW IN OPPOSITION TO
TO DEFENDANTS' MOTIONS
**FOR SUMMARY JUDGMENT**

## STATEMENT OF FACTS

Plaintiff, Joshua Prowisor, is a thirty three year old male who resides in the Town of Newburgh, County of Orange, State of New York. <u>See</u>, Deposition of Prowisor at 4, 7, Exhibit 1 to Sussman Affirmation.  He is a college graduate with a degree in business management. <u>Id.</u> at 9.  Prowisor is Caucasian. <u>Id.</u> at 14.

At the time of the alleged criminal incident, plaintiff managed a retail store, George's Auto Body, an independently-owned NAPA-franchised store in the Town of Montgomery.  <u>Id.</u> at 10, 12.  He had no criminal history of any sort. <u>See</u>, Deposition of Roth, at 25-27, Exhibit 2 to Sussman Affirmation.

Defendant Bon Ton, Inc. is a corporation with headquarters in the State of Pennsylvania.  It operates department stores, including one on Route 300 in the Town of Newburgh, County of Orange, State of New York. [Prowisor at 19].  It

may sue and be sued.   Defendant Town of Newburgh is a municipal corporation organized pursuant to the laws of the State of New York.  It operates and funds a police Department and may sue and be sued.

As of January 28, 2004, defendant Roger S. Roth, Shield #27 was a member of the Town of Newburgh Police Department. <u>See</u>, Roth at 5.  The actions complained of herein were committed under color of state law and constitute state action.

As plaintiff contends that defendants violated his constitutional rights as extended by the Fourth and Fourteenth Amendments, this Honorable Court has jurisdiction over this cause pursuant to 28 U.S.C. secs. 1331, 1343 (3) & (4) and 42 U.S.C. secs. 1983 and 1988.  In summary, plaintiff alleges that on January 28, 2004, defendant Roth arrested plaintiff upon the complaint of defendant Bon-Ton Department Store [of Newburgh] acting through its agents.  Said arrest would not have occurred but for the false supporting deposition of Bon-Ton Department Store loss prevention officer Lloyd Rajcoomar.  Said arrest also would not have occurred but for the failure by defendant police officer Roth to conduct a reasonable investigation into the underlying charges or to speak with the plaintiff at the department store before charging him.

Specifically, on January 28, 2004, plaintiff came to Bon-Tons to return certain items he had previously purchased. Prowisor at 20.  Prowisor brought those

items to the store in a bag and had receipts for them. Id. at 21-22. After selecting

larger sizes of the same items, Prowisor brought over the old and new items to a

counter and left them there. Id. at 25-27. At the time, plaintiff was a rather

frequent customer of the store and intended to stay at the store and shop for other

things. Id. at 23. After leaving these items at the counter, plaintiff began shopping

in the men's department, selecting and carrying items he wished to buy. Id. at 28.

Eventually, he brought these new items to the same counter where he had

previously placed the others. Id. at 29.

Plaintiff then walked over to the earmuff area, about twenty feet from the

counter where he had left the selected items. Id. at 29-30. As of this time,

plaintiff had not noticed anyone watching him and did not know of any video

surveillance system in the store. Id. at 31-32.

At the earmuff area, plaintiff saw a pair of black earmuffs on a mannequin.

When he attempted to get them and try them on, the mannequin fell down.

Plaintiff picked the mannequin up, and, unable to remove those earmuffs, started

rummaging through other earmuffs which were kind of throw around. Id. at 32-33.

Plaintiff could not find another pair of black earmuffs, but picked up another kind

he was considering buying. He then starting walking around the men's section to

see if there was anything else he might want to purchase and decided not to

purchase the earmuffs. He then walked back to the earmuff section to return the

set he was carrying.  Id. at 33-34.  As he so proceeded, Prowisor held this pair of blue earmuffs in his hands.  Id. at 35.  He arrived at the earmuff section and placed the earmuffs with the others.  Id. at 36.  He then walked away from that section and toward the counter where he had placed all his clothes.  Id.

Just as he placed the ear muffs back with the others, plaintiff received a phone call from his long-time girl friend.  Unable to get good reception in the store, Prowisor walked around looking for a better place to speak with her.  After a moment or two, he placed his cell phone back in his jacket pocket, unable to get good reception. Id. at 38-39.

Plaintiff never left Bon Ton Department Store with earmuffs for which he had not paid. Id. at 35.  Nor did he go near the exit to the store while holding earmuffs. Id. at 40.  Nor did he conceal earmuffs in his pockets or anywhere else while in the store.  Id. at 35.

Despite this, as he was proceeding away from the ear muff section and toward the counter where his clothes were laid, two non-uniformed Bon Ton security guards, Lloyd Rajcoomar and Ken Carlson, came running from plaintiff's right side , yelling that he come with them. Id. at 39-40. At that moment, plaintiff was about fifteen feet shy of the counter, walking there with a purpose - to pay for his items and leave the store. Id. at 44-45.  Lloyd Rajcoomar did the talking for the two loss prevention officers, demanding that plaintiff come with them. Id.  When

plaintiff inquired why, these agents told him that he had stolen ear muffs and had to come with them.  Id. at 46. [1]

Plaintiff was shocked and stated that he did not take anything, there was no reason for him to go anywhere and he had not done anything wrong.  Id.  He told security that he had receipts for the items he had come to return in his pocket and could prove he was not there to steal anything.  Id. at 47.  When Rajcoomar told him that he had seen the plaintiff steal earmuffs and throw them on the ground, plaintiff replied that he had returned the earmuffs he had been thinking of purchasing and asked the security officers to search his person.  Id. at 47-48.  When the security officer claimed that plaintiff had thrown the earmuffs on the ground, Prowisor challenged him, asking "Well, then, where are they?"  The security officer had no answer for that.  Prowisor repeated that he had clothes on the counter for purchase and that he had other clothes he was returning.  Id. at 48.

With a security guard on either side of him, Prowisor walked about 100 feet to a small security office.  Id. at 49.

Before they even commenced walking, Rajcoomar told Prowisor that "[W]e have you on videotape".  Plaintiff responded, "Okay. Good. That's great.  Let's go watch."  Prowisor was excited with this prospect and challenged the security

_____

1  As of this time, Rajcoomar had worked for Bon-Ton for about six months.  See, Exhibit 3 to Sussman Affirmation, Transcript of Trial in Town of Newburgh Justice Court, July 28, 2004, p. 35, ll. 19-24.

guards to watch the tape which would show he did not take anything.  Indeed, after being told that they had him on tape, plaintiff pleaded with the Bon Ton agents to play the tape which would establish his innocence. Id. at 50.

Once at the office, Prowisor asked the security guards to play the tape.  They refused and claimed they would show the judge and jury the videotape. Id. at 51. [2]  Prowisor argued that this was ridiculous, that he had done nothing wrong and should be given the chance to show that through the tape right then. Id.  At this point, Rajcoomar got right in Prowisor's face and the two men argued about the video-tape and plaintiff's continued protestations of innocense. Id.  at 53, 57-58.  During these brief minutes, Bon Ton agents were set in their conclusion and they disallowed Prowisor from showing his receipts or explaining his side of the story. Id. at 58.

In the security office, while not speaking in soft tones, Prowisor denied cursing.  Id. at 54.  On the other hand, Rajcoomar was in plaintiff's face, yelling, "Shut the F up" several times. Id. at 55.   While the security guards never told plaintiff he could not leave, one was blocking the closed door and plaintiff had the distinct impression he was not free to walk out of the small room. Id. at 56-57, See, Roth at 65 [door closed when he arrived].

Shortly after Rajcoomar got in his face, defendant, Town of Newburgh

_____

2  At plaintiff's criminal trial, Rajcoomar admitted that he did not allow Prowisor to view the video tape the night of the incident.  See, Exhibit 3 to Sussman Affirmation at 65.

Police Officer Roth arrived.  Id.   Roth responded to a dispatch which advised him that a "larceny was in custody".  See, Roth at 14.  This meant that Bon-Ton Loss Prevention had taken custody of Prowisor. Id.

Upon arrival at Bon-Ton's on January 28, 2004,,  Roth had no discussion with either security officer outside of plaintiff's presence. See, Roth at 13.

When Roth entered the security office, Rajcoomar began explaining to him that plaintiff had tried to steal ear muffs.  According to Ross, Rajcoomar stated that plaintiff took a pair of earmuffs and concealed them in his pocket." See, Roth at 35.  Plaintiff attempted to defend himself, denying this accusation.  See, Roth at 33-34.   Plaintiff tried to explain why he was in the store and to show Roth his receipts for the items he had come to return.  He wanted to show the officer that what he was saying was true. See, Prowisor at 60.

Feeling that Roth was not listening to him, plaintiff became louder.  Roth got in his face and told him to "Shut the F up" on several occasions. Id. at 61. [3]  As plaintiff attempted to provide Officer Roth with his side of the story and requested that he watch the surveillance tape which would exonerate him, defendant Roth cuffed him very tightly. Id. at 61-62.[4]   As the pain was difficult for Prowisor to

3  Roth agreed that after asking Prowisor to quiet down several times, he "loudly told Mr. Prowisor to shut up.  I might have cursed...I do not remember, but it's quite possible." See, Roth at 34.

4  According to Roth, he felt that neither plaintiff nor the security guards were "acting their age and being calm," and "so I decided at that time to physically handcuff Mr. Prowisor and remove him from the environment." See, Ross at 34.

bear, he decided to stop trying to explain his side of the story. Id. at 63.

Before Roth cuffed plaintiff, neither security guard ever provided Roth the earmuffs it was claimed plaintiff had dropped or thrown on the ground as he was walked from the ear muff area of the store to the loss prevention office.  See, Roth at 13, 24, Also see, Box 61 of the Arrest Report by Roth, Exhibit 5 to Sussman Affirmation. Neither security officer told Roth that he knew where a pair of ear muffs plaintiff had allegedly attempted to steal were located or suggested her had possession of such earmuffs.  Id. [5]  Neither security officer represented to Roth that plaintiff had left or attempted to leave the store with the earmuffs. See, Roth at 28, 37. [6]  Indeed, on the contrary, Roth claims that he made inquiry as to whether Prowisor was in the store the entire time and he was told that plaintiff was. Id. at 28-29, 46, ll. 16-19. [7]

---

Prowisor had never been handcuffed before. Id. at 65.

5  Yet, at Prowisor's criminal trial, Rajcoomar claims that when he was following plaintiff back into the store and then through the store to loss prevention, plaintiff reached his hand into his right jacket pocket and ear muffs then fell to the floor. See, Exhibit 3 to Sussman Affirmation at 50-51.

6  Yet, in his report and at the criminal trial, Rajcoomar claimed that plaintiff actually left the store with earmuffs, walking past the counter without paying for the item. See, Exhibit 3 to Sussman Affirmation at 47-48, and Exhibit 6 to Sussman Affirmation for Shoplifting Apprehension Report Rajcoomar prepared.

7  Critically, in their own paperwork, Bon-Ton's security guards claimed that after placing earmuffs into his right jacket pocket, Prowisor "then exited without offering payment via mall entrance." See, Exhibit 8  to Sussman Affirmation.  Roth was NEVER told this nor did this ever happen, according to the plaintiff. See, Roth at 46 [Rajcoomar told Roth that plaintiff HAD NOT left the store].

After cuffing Prowisor, Roth observed that plaintiff became more subdued. But, in that light, defendant Roth had no discussion with Rajcoomar about any physical evidence the latter man had verifying shoplifting and no conversation about any video tape. See, Roth at 56.

The business records produced by the Town of Newburgh Police Department show that Roth was dispatched to Bon Ton at 20:57 [8:57 p.m.], arrived at Bon-Ton at 22:09 [10:09 p.m.] and left with Prowisor one minute later, at 10:10 p.m. See, Exhibit 4 to Sussman Affirmation. Roth acknowledged that these times all are the result of radio communication between dispatch and himself. See, Roth at 18-19. He could not explain the discrepancy between the times listed on the department's official records and his own memory of the incident. Id. at 19-20.

At plaintiff's criminal trial, Roth testified that the Town of Newburgh Police Department had a policy in January 2004 of arresting any "shoplifter" if a retail store's loss prevention officer is prepared to sign a sworn statement that the person stole merchandise. See, Exhibit 9 to Sussman Affirmation for sworn testimony of Police Officer Roth given on July 29, 2004 during criminal trial of plaintiff, pp. 218-19. According to Roth, this testimony was accurate when given. See, Roth Deposition at 59.

In deposition during this case, Roth testified that in certain circumstances,

"if it is appropriate," an investigation "can be made" by a Town police officer regardless of whether a loss prevention officer is prepared to sign a sworn statement. Id. at 11. "We will do an investigation if we feel it needs to be done." Id. at 12.   When asked to recall whether he had ever conducted such an investigation, Roth could not recall any such instance.  Id. & 48.

Roth had no knowledge of Rajcoomar's training, whether Rajcoomar had ever testified at a criminal trial before or how long Rajcoomar had worked as a security officer. See, Roth at 49.  Before the incident in question, Roth had told Rajcoomar that he would make an arrest solely based on his sworn complaint. See, Roth at 51.  Roth told Rajcoomar this because he understood from her supervisors that this was the policy of the Town of Newburgh. See, Roth at 52-53. Regardless of whether the alleged shoplifter protested his innocense, the Town of Newburgh's policy is to effect an arrest so long as someone is prepared to sign a complaint. Id. at 54.  Roth's superiors told him to take a video if it is practical, but never directed to note in his police report any request for a video. Id. at 54-55.

While at the store, Roth could not recall learning that Rajcoomar had a video-tape of the event. See, Roth at 30.  The security guards did not offer to play Roth the video tape. Id.

After Roth arrived and as Prowisor remained seated in the security office, the female manager with whom plaintiff had spoken earlier about leaving his

return items at the counter came in.  Prowisor hoped she would confirm what had occurred earlier, but she remained quiet. Id. at 64. [8]

While in the security office, Prowisor observed neither security guard sign off on any paperwork. Id. at 70.  On the other hand, Roth claims that Rajcoomar signed a criminal complaint in Prowisor's presence. See, Roth at 36.  Roth did not speak with the other security officer, Ken Carlson who did not sign any statement implicating plaintiff. See, Roth at 42-43..

Defendant Roth then walked plaintiff through the store in handcuffs.  Id. at 65-66.  They stopped at the check-out counter where Roth was able to match up plaintiff's receipts [which the police officer took from plaintiff's pocket] with the items to be returned. Id. at 67.

Roth placed plaintiff in the police car and drove him to the police station. Id. at 68.  There, with plaintiff hand-cuffed, Roth took  pedigree information, photographed and finger-printed him.  While at the police station, Prowisor continued to deny that he stolen anything.  See, Roth at 39. Roth responded, "you were arrested on the sworn statement of another person and the Town of Newburgh is acting as an agent of the Bon Ton and that goes into the determination of an arrest being made." See, Roth at 39.

Roth never Mirandized plaintiff and never interviewed him concerning the

_____

8  According to Roth, when he entered the security office, Prowisor was the only person he can remember who was seated. See, Roth at 33.

events of January 28, 2004. [Roth at 7].

At the police station, defendant Roth looked at plaintiff's driver's license and stated, "Well, you're not Puerto Rican."  <u>See</u>, Prowisor at 94.  Prowisor asked Roth why he made this comment and the police officer told him that this is what the security officers from Bon-Ton's had told him. <u>Id.</u> [9]

Roth ultimately drove plaintiff back to his car at the mall and released him on his own recognizance. <u>Id.</u> at 68-69, 95. [10]  Roth advised plaintiff that he would be receiving charges in the mail.  <u>Id.</u> at 71-72.

 Plaintiff was required to return and appear in open Court [the Town of Newburgh] six or seven times prior to his trial and then for a two day trial. <u>Id.</u> at 74.

As he admitted, defendant police officer Roth acted in concert with, and as an agent for, Bon Ton and its agents, arresting plaintiff on the say so of Bon Ton's agents who failed to provide him any proof that plaintiff stole anything.   At the criminal trial, Defendant Bon Ton's agents claim that while he was being led to the security office, plaintiff threw down the ear muffs he was attempting to steal.

---

9  Roth testified to the contrary, claiming that when he asked plaintiff his ethnicity, Prowisor remarked, "I think that the security guards at the Bon-Ton did this to me because they thought I was Puerto Rican," to which Roth claims to have responded, "But you're not even Puerto Rican." <u>See</u>, Roth at 23.

0[0]  Plaintiff estimated he was in the security office for fifteen minutes and the police station for 20-25 minutes. <u>Id.</u> at 69. Roth testified that plaintiff was at the police station with him for about thirty minutes. <u>See</u>, Roth at 7.  Plaintiff was released on his own recognizance upon the direction of Roth's superior. <u>See</u>, Roth at 5-6.

These security guards claim that they picked up these ear muffs.  However, they did not show these ear muffs to defendant Roth.  The earmuffs were never produced at the criminal trial.  Nor did the security officers show the surveillance tape to officer Roth. [11]

Police officers from the Town of Newburgh routinely arrest individuals who, Bon Ton staff claim, have engaged in illegal conduct.  According to Roth, the Town of Newburgh Police Department does not review such proposed arrests for probable cause, but, rather simply takes the word of the security officers that the alleged violator has engaged in shop lifting.

Plaintiff's arrest came without any probable cause as none of the defendants or their agents ever found a pair of stolen earmuffs on plaintiff's person at any time during the incident in question.  Defendant Roth made no effort to take custody of the allegedly stolen ear muffs at the scene.  See, Roth at 43.  Before arresting plaintiff, defendant Roth knew that Bon Ton had a surveillance system which yielded video tapes. See, Roth at 42.  Roth did not ask to see the video to confirm the store's version of events and Rajcoomar never volunteered to show it to him.. See, Roth at 30, 42.  Roth conceded that the video could have been of interest to

---

[11]  When asked why he did not demand the surveillance tape before arresting plaintiff, Roth stated that this was "because Mr. Prowisor and Mr. Rajcoomar had the inability to be quiet. They were acting very hostile toward each other, which I did not think was an appropriate scene. And so I thought the most important thing to be done at that moment was to separate the individuals, in which case take Mr. Prowisor back to the police station." See, Roth at 41-42.

him in investigating plaintiff's actions, but recalled no discussion of the video in his presence. See, Roth at 30-31.

According to Roth, the decision to prosecute in this case was made by an agent of Bon-Ton, Rajcoomar. See, Roth at 62.  He, Roth, was in charge of the prosecution. Id.

On July 29, 2004, a petit jury, empaneled in the Town of Newburgh Justice Court, cleared plaintiff of the criminal charge of petit larceny, P.L. 155.25, which defendants pressed despite knowing that the video evidence established his innocence. Id. at 76. [12]  Plaintiff paid some $8,500 for his criminal defense. Id. at 73-74.

Due to the wrongful and false arrest to which he was subjected and the malicious prosecution undertaken at the defendants' instance, plaintiff testified that he was caused emotional distress, humiliation, unnecessary legal expenses and anxiety.

In his Complaint, plaintiff claims that defendants acted jointly to violate rights guaranteed him under due process and equal protection clauses of Fourteenth Amendment and the Fourth Amendment as made actionable by 42 U.S.C. sec. 1983 by falsely arresting plaintiff without probable cause and on the basis of racial profiling and by maliciously prosecuting plaintiff after it was clear that the cited

---

2[2]  The jury watched the video tape before acquitting plaintiff. [Prowisor at 93].

videotape cleared plaintiff.

After discovery, defendants have now made motions for summary judgment.

## LEGAL ARGUMENT

### I. Standard for Adjudicating Summary Judgment Motions

On a motion for summary judgment, a district court must take the facts as attested to by the non-moving party, draw all favorable inferences therefrom and determine only whether a reasonable jury could decide the case in his/her favor. That the parties sharply disagree on the facts is relevant only in that the district court is constrained to reject the disputed facts relied upon by the moving party and may make no credibility determinations in deciding whether material, disputed facts preclude summary judgment. **See**, generally, <u>Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.</u>, 475 U.S. 574 (1986).

The moving party has the burden of demonstrating the absence of a disputed issues of material fact. <u>Celotex c. Catrett</u>, 477 U.S. 317, 323 (1986). If such a showing is made, the non-movant must present specific facts upon which there is a genuine issue for trial. Fed.R.Civ.P. 56(e).

### II. The Town of Newburgh had an Unconstitutional Arrest Policy

Plaintiff alleges several causes of action, one of which is that the Town of Newburgh implemented an unconstitutional arrest policy which caused him injury. On the facts taken most favorably to the plaintiff, defendant Roth implemented the

Town of Newburgh arrest policy in this instance. <u>See</u>, Plaintiff's Counter-statement of material and disputed facts, paras. 63-64, 68-70, 82.  Under that policy, as explained to Roth, a junior officer, by his superiors, so long as a complainant is prepared to sign an information, probable cause exists for an arrest. And, judging from the facts of this case, that information need not specify the details which predicate the alleged criminal infraction, but can be entirely conclusory.

Moreover, before this incident, Roth told Rajcoomar that he would arrest anyone the latter security guard wanted.  Roth explained that he viewed himself as the store's agent.  These facts underscore the inter-connectedness between the defendants and the absence of any commitment to basic fairness and neutrality as between disputatious parties here demonstrated.

In response, the Town blatantly distorts the record and claims that Roth was NOT acting pursuant to an established municipal policy.  This is plainly false as the officer testified to precisely the opposite set of facts: he was implementing a no ask/just arrest policy so long as the security officer was prepared to sign the most conclusory statement which failed to meet the requisites of an information in the State of New York.  <u>See</u>, Exhibit 7 to Sussman Affirmation in which the deponent provides no basis for his claim that plaintiff stole anything from Bon-Ton's.

### III.  <u>No probable cause for an arrest was demonstrated to Roth</u>

"Probable cause to arrest exists when the authorities have knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested."  Golino v. City of New Haven, 950 F.2d 864, 870 (2d Cir. 1991), *cert. denied*, 112 S.Ct. 3032, 120 L.Ed.2d 902 (1992), cited approvingly in Lennon v Miller, 66 F.3d 416, 424 (2d Cir. 1995).  "A law enforcement officer must conduct a reasonable investigation under the circumstances prior to making an arrest."  Kerman v. City of New York, 261 F.3d 229, 239-41 (2d Cir. 2001).

Here, on the facts both known to Roth at the time he cuffed plaintiff, Rajcoomar accused Prowisor of stealing earmuffs.  Prowisor vehemently denied this and, in Roth's presence, requested to view the video tape which Rajcoomar stated confirmed his guilt.  Rajcoomar refused to show anyone the video tape and Roth denied any knowledge of this specific tape, though, according to Prowisor, this was discussed in his presence and, more generally, Roth admitted knowing that Bon Ton's used surveillance cameras in its stores.

While Rajcoomar later testified in the criminal trial that plaintiff EXITED Bon-Ton's with a concealed pair of earmuffs, Roth denied that Rajcoomar ever told him this and the conclusory information makes no such claim.  Again, Prowisor vehemently denies he either concealed the earmuffs NOR exited the store.  Indeed, when confronted in the store by the guards, he demanded that they

pat him down to confirm his innocence.

Roth could not have predicated the arrest on any claim that Prowisor exited the store with earmuffs and was apprehended elsewhere in the mall. This is so because, at deposition, he testified that he asked Rajcoomar whether plaintiff left the store and reported that Rajcoomar told him that Prowisor remained in the store.

Accordingly, Roth could not have acted on the basis that videotape evidence confirmed Prowisor's guilt or on the basis that Rajcoomar and Carlson apprehended the plaintiff outside of the store with store merchandise: Roth claims to have been told neither in his brief interaction with the Bon-Ton's security personnel.

Likewise, while Rajcoomar claims that Prowisor threw down a pair of earmuffs as he was being accompanied by loss prevention officers toward the security office, Prowisor denied this and Rajcoomar never provided any evidence to support this claim to the police officer.  Indeed, by his own account, Roth was not aware of any such claim when he arrested Prowisor.  He never testified that based on any such account, he arrested the plaintiff.

Put another way, Roth was required to gather sufficient evidence to gain a basis for plaintiff's arrest.  What would have been more relevant and simpler for a person of reasonable caution than obtaining a pair of  earmuffs, out of their packing, recovered from the floor as Prowisor was being walked back to the

security office?  Put alternatively, what would more plainly have vindicated Prowisor right then and there then Roth's request for such evidence and the Bon Ton agents' failure to produce the same?

Here, according to Rajcoomar, Roth never requested any such evidence and he did not provide it.  On the other hand, Roth denies that Rajcoomar ever told him that plaintiff threw down evidence as he was being walked back to the security office.

Either way, the absence of any evidence of an alleged theft undercuts the existence of probable cause.  Had plaintiff illegally taken possession of an item with the intent to steal it, at some point Bon Ton or Roth should have taken custody of that item and recorded that fact in an information.  This was never done here as the information is wholly conclusory and provides none of the subordinate facts in support required by our penal law.

The fact that someone is prepared to file a criminal complaint against another does not absolve a police agency of doing basic investigation before determining whether to place the alleged perpetrator in custody.  Any other legal rule would allow one individual to revenge himself another without any neutral determining whether probable cause does or does not exist for such an arrest.  In our system, the police provide that role and are not permitted merely to rubber-stamp an otherwise uncorroborated complaint by making an arrest.  That principle

has particular saliency here where Roth has admitted that he arrested plaintiff and took him into custody as much to remove him from a hostile situation partly of Rajcoomar's making than for any other reason.

When asked why he desisted from any investigation, Roth responded that both Prowisor and Rajcoomar were not behaving their age and he needed to remove Prowisor from the situation. Even if he felt a need to separate these two men, this instinct could not justify arresting plaintiff for petit larceny absent some concrete evidence that plaintiff had engaged in that crime.

Under these facts, that burden could have been had Rajcoomar gave the police officer the earmuffs he claims plaintiff threw down or even the empty earmuff case he claims plaintiff left behind when he took these earmuffs. But, Rajcoomar, who was evidencing hostility toward the plaintiff when Roth arrived, provided no substantiation against plaintiff's vehement and repeated denials of wrongdoing.

Likewise, though concededly knowledgeable about Bon-Ton's taping system and though present while plaintiff begged to see the tape to exonerate himself, Roth's only excuse for not demanding the tape was that Rajcoomar was contributing to a hostile situation and was not acting his age. This is simply an insufficient basis to curtail even basic investigative work and make an arrest.

On these facts, plaintiff has raised material issue of fact as to whether Roth

cared if probable cause existed or merely was prepared to arrest plaintiff based on the conclusory assertion of Rajcoomar.  By Roth's own account of municipal policy, the latter is certainly one reasonable conclusion a jury could draw.  And, as Rajcoomar plainly failed to provide Roth with available evidence [if his story were to be believed] and failed to advise Roth of a critical fact [that plaintiff exited the store with the earmuffs concealed], the basis for this arrest, if any, is certainly legally questionable.

In response to his plain failings [in apparent fulfillment of the Town's "arrest now and ask questions later policy"], Town defendants confuse performing basic policy work with an "exhaustive investigation".  See, Memo of Law submitted on behalf of Town of Newburgh and defendant Roth at 4-5.   While police officers may not be under an obligation to investigate every lead, Gisondi v. Town of Harrison, 72 N,.Y.2d 280, they need to have probable cause to believe a civilian account before they credit it and premise an arrest on it.  Here, before the arrest, Roth had given Rajcoomar carte blanche, telling him that if you will sign a complaint, I will make an arrest.  Roth viewed himself as an agent of Bon-Ton's, abdicating any responsibility to determine probable cause.  Roth did not know Rajcoomar, his training, his track record or anything about him. He did not know whether Rajcoomar had peace officer status.  In short, he had no basis to simply take Rajcoomar's word over that of Prowisor absent some evidence that the

plaintiff committed a crime.

Where a theft of a tangible object is involved, it is hardly tantamount to investigating every lead to require a police officer to ask where that object now is, has it been recovered and, if so, to voucher that object into evidence. Rather than investigating every lead, such an exercise sounds more like Basic Policing 101. And, if a video of the alleged theft exists, which is precisely what Rajcoomar told the plaintiff, it would hardly be too much to ask the officer to retrieve the same [as apparently was departmental policy "where possible"].

### IV.  **Plaintiff was arrested as the result of racial profiling**

Plaintiff testified that once at the police station and after seeing his driver's license, defendant Roth remarked that Prowisor was not Puerto Rican after all. When plaintiff queried the basis for any such comment, defendant Roth stated that the security guards had told him plaintiff was Puerto Rican. As plaintiff never discussed his ethnicity with the security guards, this set of comments demonstrates a prima facie case of racial profiling. Plaintiff denied that he committed any crime. The responding police officer did not conduct the barest investigation at the scene, instead simply tightly cuffing plaintiff when he protested his innocence. Then, at the station, Roth let out that the security officers, who failed to produce any tangible evidence of his guilt, believed he was Puerto Rican.

Defendants would like this Court to determine that the comment Roth made,

"Well, you're not Puerto Rican," and then his further explanation that this is what

Bon Ton's security officers told him does not amount to racial profiling, but, rather

is a "harmless comment" made long after the arrest.  First, the comment was not

made long after the arrest.  Second, absent any evidence that plaintiff actually had

possession of any stolen property at any time, this reference is explanatory of

defendants' cumulative hostility toward the plaintiff - the *belief* that he was Puerto

Rican.  As previously noted, as Roth testified, he acted as an extension of Bon-

Ton's, not as an independent evaluator of probable cause.  <u>See</u>, Plaintiff's Counter-

statement of Material, Disputed Facts, para. 82.  That the Bon Ton's security

officers told him that *they* thought plaintiff was Puerto Rican gave Roth plain

indication - along with the absence of any tangible evidence supporting the

proposed arrest, that the proponents of this arrest were engaged in racial profiling.

The Town's brief distorts Roth's own testimony at deposition as to what

occurred at the Bon Ton's security office.  <u>See</u>, Defendant Town of  Newburgh and

Roth's Memo of Law at 5.  At deposition, Rother did not claim that Rajcoomar

offered any detailed explanation of the plaintiff's alleged conduct, but, as

Rajcoomar and the plaintiff were arguing in his presence and as the former man

was prepared to sign a conclusory information, he arrested the plaintiff.

Here, the apparent facts are very simple: Prowisor was a local businessman

with no criminal record.  He was a frequent shopper at Bon-Ton's who had brought

back merchandise and receipts.  Indeed, Roth confirmed this before leaving the store with the plaintiff.  Plaintiff's accusers never presented the police officer with any tangible evidence demonstrating that they had caught him with some merchandise for which he had not paid or that he had thrown down on route to the security office.  There was no basis to believe Prowisor was guilty of anything.

And, in light of the personal hostility he saw Rajcoomar display toward the plaintiff and Carlson's utter silence in his presence, Roth had reason to believe that the arrest was without any basis.  Likewise, the Town's claim that Roth had information from two officers is false: he has admitted that Carlson said nothing in his presence. See, Plaintiff's Counter-statement of Material, Disputed Facts,  para. 77.

Finally and fatally, defendant Town and Roth's argument on probable cause is wholly premised on the facts taken most favorably to defendants.  For instance, the Town brief claims that plaintiff not only concealed the earmuffs under his coat, but took them out of their case, showing control and dominion over them. However, under oath, Prowisor denied any such conduct.  And, more critically, neither security officer told Roth that he knew where the earmuffs plaintiff allegedly stole were or suggested he had custody of the earmuffs.  Neither security officer represented to Roth that plaintiff had left the store with the earmuffs. See, Plaintiff's Counter-statement of material and disputed facts, paras. 55-56.

### V. **There is sufficient evidence of malice to support the malicious prosecution claims**

Town defendants next claim that since Roth did not initiate this prosecution and since he did not, in any event, act with malice, there is no basis for a claim of malicious prosecution.  First, at his deposition, Roth stated that while Rajcoomar made the decision to prosecute this case, he, Roth was in charge of the prose-cution.  See, Plaintiff's Counter-statement of material and disputed facts, paras. 102-03.  Second, Roth arrested plaintiff to remove him from the hostile environment created by Rajcoomar, who was acting like a child, screaming and yelling at Prowisor.  See, Plaintiff's counter-statement of material and disputed facts at 52, n. 4.  Third, by suggesting that he knew that the security officer's conduct was motivated by Prowisor's assumed ethnicity, Puerto Rican, and by testifying that he arrested Prowisor merely as Bon-Ton's agent without seeing any tangible evidence, Roth demonstrates sufficient malice to create a jury question as to his actual motivation.

### VI. **Qualified Immunity Should Not Apply as Matter of Law**

Where a defense of qualified immunity is inextricably bound up with credibility determinations which are to be resolved by a jury, the district court should not grant summary judgment on this basis.   The Court of Appeals has expressed this standard as follows, a defendant is entitled to summary judgment on

qualified immunity grounds when "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inference most favorable to plaintiffs, could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." <u>Robinson v. Via</u>, 821 F.2d 913, 921 (2d Cir. 1987), cited in <u>Lennon v. Miller</u>, 66 F.3d 416, 420 (2d Cir. 1995).  Where the factual record is in serious dispute, the Court should not decide the question of qualified immunity. <u>Lennon</u>, <u>supra.</u> at 421-22, citing <u>Johnson v. Jones</u>, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995)(Courts of Appeals lack jurisdiction to review denials of qualified immunity based on district court determination that "certain factual findings are essential to resolving the qualified immunity question"). [13]

Here, where the police officer perceived himself simply as an extension of Bon-Ton's security operation and did absolutely no inquiry into the actual bases for the arrest, asked for no corroborating evidence, though the same would plainly be expected in a case of petit larceny, knew of the existence of the video surveillance taping system, but never sought the tape and failed to listen to the accused's explanation of what happened, qualified immunity should be rejected at this stage of the proceedings.

Unlike the situation in <u>Lennon</u>, <u>supra.</u>, where the police officers witnessed

---

[13]  We note that in <u>Lennon</u>, <u>supra.</u> at 426, the Court of Appeals noted that "none of the material facts are in dispute."  The same cannot be said of the record in our case.

the entire dispute as between the wife and husband, saw the title to the vehicle possessed by the husband and then observed the wife jump in the vehicle and attempt to prevent him from driving it away, here, the police officer saw none of the allegedly criminal acts.  The question then becomes whether no reasonable police officer would have arrested the plaintiff absent some proof that he actually sought to conceal or otherwise steal earmuffs.  See, Lennon at 423-24.  On the facts taken most favorably to plaintiff, no such evidence of any sort was presented to the police officer.  One of the two security officers said nothing to Roth about the circumstances.  The other was screaming at the plaintiff, denying Prowisor the chance to explain the circumstances to Roth.   This hostility caused Roth to arrest plaintiff to remove him from a hostile situation.  Rajcoomar never provided Roth the ear muffs he claims Prowisor "threw down" as he was being led back to the security officer; he never provided the officer with the allegedly empty case out of which these ear muffs came.  He never told the officer he had a surveillance tape which provided plaintiff's guilt.  And, the police officer, more critically, despite plaintiff's strenuous protestations and request to see the surveillance tape, never requested the tape, the ear muffs or the case.  These actions, we submit, were so flawed such that no reasonable officer would have made a similar choice.  Lennon, supra. at 425.

These facts are also distinguishable from those presented in Lee v. Sandberg,

136 F.3d 94, 103-04 (2d Cir. 1997), where the Court extended qualified immunity to police officers who made a statutorily mandated domestic violence arrest after the alleged victim swore out a statement that her husband had karate chopped her arm and after they spoke with her psychiatrist who attested that she was "not disassociating and could accurately relate facts about her alleged assault." Id. Here, the evidence shows that based on a Town policy, defendant Roth abdicated the role of an objective and cautious police officer and merely took Rajcoomar's complaint without considering the ample circumstances which raised doubts as to his veracity, to wit, plaintiff had receipts showing he had come to the store to return clothing which he had brought back to the store and placed on the counter; Rajcoomar produced no evidence that plaintiff had concealed any item and refused to show him and plaintiff the surveillance tape which, he alleged, proved plaintiff's guilt.  Moreover, plaintiff was vociferous in his denial of culpability, had no criminal record and was the owner of a retail business in the neighboring Town. All of these facts should have raised reasonable doubt in Roth's mind as Rajcoomar's veracity. Singer v. Fulton County Sheriff, 63 F.3d 110, 119 (2d Cir. 1995), cited in Curley v. Village of Suffern, 265 F.3d 65 (2d Cir. 2001).  Unlike Ricciuti v. N.Y.C. Transit Authority, 124 F.3d 123, 128 (2d Cir. 1997), despite a suspect's protestations of innocence, probable cause was provided by the visible injuries the victim showed.

VII.  **Bon Ton's is a State Actor for Purposes of this Suit**

Contrary to Bon-Ton's arguments, a person may be found to be a state actor when "he has acted together with or has obtained significant aid from state officials".  Angelico v. Lehigh Valley Hosp., Inc., 184 F.3d 268, 277 (3d Cir. 1999), citing Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982).   Put another way, "[p]rivate parties, jointly engaged with state officials in [a] prohibited action, are acting `under color' of law for purposes of section 1983." United States v. Price, 383 U.S. 787, 794 (1966).

In a like case like this one, this Court previously determined that the New York State Police and Fleet Bank acted in concert in violation of 42 U.S.C. sec. 1983 when they interrogated and conspired to coerce a false confession from her. See, Niemann v. Whalen and Fleet Bank of New York, No. 96-7861 (2nd Cir. 1996).

Based on these allegations and the statements of Roth, Bon-Ton's security force and he jointly arrested the plaintiff, who was considered a "shoplifter" as soon as he was taken into custody by Bon-Ton's.  Indeed, according to Roth, he need not do any investigation into the facts once Bon-Ton's agents held the plaintiff and agreed to sign a summary and conclusory information.

VIII.  **Bon-Ton's Agents detained plaintiff**

Bon-Ton's next contends that its agents did not arrest the plaintiff because

they did not actually apply cuffs to him or detain him through physical means. However, according to Prowisor, he felt compelled both to accompany Bon-Ton's agents and was not free to leave the closed security office. One of the two officers blocked the door and he was never advised be could leave. Moreover, when he protested his innocence, Rajcoomar got into his face and cursed him several times.

In addition, before this incident, Roth advised Rajcoomar that he would arrest anyone the Bon-Ton's security force asked him to arrest and was prepared to vouch had attempted to shop lift.

Under these circumstances, it is plain that Bon Ton's agents were holding the plaintiff for arrest by the Town Police Department, who security called. Thus, the claim that Bon-Ton's agents did not make the arrest is fatuous.

That Bon Ton's employees claim to have seen plaintiff engage in shop lifting does not determine probable cause where plaintiff denies that he engaged in any such activity and a petit jury has rejected defendants' claims. In this light, taking the facts most favorably to the plaintiff and in light of the failure to the security officers to provide any tangible evidence to Roth, this Court cannot grant summary judgment based on the defendants' disputed accounts of plaintiff's conduct in the store.

Equally frivolous is defendant Bon-Ton's claim that plaintiff lacks evidence to support his racial profiling claim because he is, in fact, Caucasian. The heart of

his profiling claim is that co-defendant Roth told plaintiff that Bon-Ton's officers reported to him, without any basis, that plaintiff was Hispanic.

Finally, on his malicious prosecution claim against Bon-Ton's, this defendant concedes that evidence that its employees "misled the prosecution officer" can predicate a malicious prosecution claim. See, Bon-Ton's Memorandum of Law at 26-27.  This is precisely what plaintiff claims here: as Roth testified, Bon-Ton's complaint fueled plaintiff's prosecution.  Absent the false claims which Rajcoomar advanced throughout these proceedings, plaintiff would not have been charged or tried or suffered the injuries of which he complains.  That Roth contributed to the injuries by failing to properly discharge his responsibility to cautiously investigate any claim of criminal conduct does not absolve Bon-Ton's of its role in plaintiff's malicious prosecution.  As plaintiff satisfies each element required for a malicious prosecution claim, this Court should deny defendant's motion to strike the same as against it.

## **CONCLUSION**

For the above stated reasons, defendants' motions should be denied in their entirety and this matter scheduled for trial.

Respectfully submitted,

MICHAEL H. SUSSMAN

SUSSMAN LAW OFFICES

PO Box 1005
Goshen, NY 10924
(845)-294-3991

Counsel for Plaintiff

Dated: January 30, 2006